834 So.2d 944 (2003)
NET FIRST NATIONAL BANK, Craig Connors, Laura K. Pugliese, Randall R. Rossilli, Richard Pasley, William A. High and Glenn E. Gromann, Appellants,
v.
FIRST TELEBANC CORP., a/k/a Net First Financial Corporation, Keith F. Duffy and Bradley B. Groves, Appellees.
No. 4D02-519.
District Court of Appeal of Florida, Fourth District.
January 22, 2003.
*945 James S. Telepman of Cohen, Norris, Scherer, Weinberger & Wolmer, North Palm Beach, for appellants Craig Connors, Laura K. Pugliese, Randall R. Rossilli, Richard Pasley, William A. High and Glenn E. Gromann.
Thompkins W. White and Edward W. Dougherty, Jr. of Igler & Dougherty, P.A., Tallahassee, for appellees.
PER CURIAM.
This is an appeal from a non-final order granting a temporary injunction that prevents *946 Appellants from acting in their former roles as directors of Net First National Bank. Jurisdiction is under Florida Rule of Appellate Procedure 9.130(a)(3)(B).
I. Background
This complex case involves two groups of investors battling for control of Net First National Bank ("the Bank") and the Bank's sole shareholder, First Telebanc Corporation ("the holding company"). The events leading to the present rift in leadership began in January 1999, when the directors of the Bank appointed Keith Duffy to fill a vacant director position. Sometime prior to May 2000, the Bank was designated a "troubled institution" under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").
In June 2000, Duffy began acting as president and chief executive officer of the Bank. Throughout this time, the Bank experienced increasing financial difficulties, resulting in a Consent Order and Stipulation between the Office of the Comptroller of Currency ("OCC") and the Bank. The order gave the OCC increased oversight of the Bank's business dealings, most importantly a veto power over any proposed senior executive officer.
Pursuant to FIRREA requirements, Duffy submitted a form 914 Notice to the OCC detailing his qualifications for his senior executive and director positions with the Bank. Duffy was later interviewed, and the OCC declined to grant him authority to act as a senior executive of the Bank, stating that he did not have sufficient experience to hold a leadership position in a "problem bank." The OCC did not object at that time to Duffy's continuing as a director.
In February 2001, however, the OCC nullified its non-objection to Duffy serving as director. In a five-page letter, the OCC detailed material misrepresentations and omissions Duffy made in the biographical portion of his 914 application and his interview. The OCC found that Duffy gave a false answer and omitted material information regarding his past involvement with a state-chartered bank, then continued to misrepresent facts and give inconsistent explanations in subsequent documents and his interview.
At the center of Duffy's misrepresentations to the OCC was his past involvement with a state-chartered bank. Duffy failed to disclose that his application to serve as president of the state bank was disapproved by Florida's Department of Banking and Finance. Duffy also failed to disclose that after disapproval, he continued to serve as president of the state bank, in violation of the Department's numerous demands that he step down. The state bank was in poor financial condition and under a cease and desist order from the State Comptroller when Duffy arrived, and it deteriorated further during his tenure, with criticism of his performance including "inappropriate insider transactions involving Duffy-related companies, a number of violations of laws, and continued noncompliance with the cease and desist order." As a result, the OCC withdrew its approval for Duffy to have any connection with Bank leadership.
In September 2000, the Federal Reserve Bank notified the board of the holding company that the OCC decision not only precluded Duffy from serving as a director of the Bank, but governed his actions as a director of the holding company as well. The Federal Reserve warned that "[h]olding company board of directors' minutes should clearly note Mr. Duffy's abstention from all policymaking decisions regarding the bank." Several months later, in May 2001, the holding company elected six directors of the Bank. They included Duffy, *947 Randall Rossilli, and Laura Pugliese, with Duffy's directorship subject to the outcome of a pending appeal of the OCC nullification. The OCC responded by advising the Bank's directors that "Mr. Duffy may not participate in the affairs of the bank or otherwise act as an `institution affiliated party' in board meetings or under any other circumstances," and that such participation subjected other directors to civil penalties. Duffy's appeal of the OCC nullification was resolved against him.
II. The Current Controversy
As of September 2001, the holding company's board consisted solely of Duffy, Rossilli, and Director Bradley Groves. At that time, the Board resolved unanimously that "Laura Pugliese is approved as Director for 914 approval." By letter date-stamped October 25, 2001, the Federal Reserve notified the holding company that it did not intend to disapprove Pugliese's appointment to the Board of the holding company, and the appointment should be consummated no less than three months from the date of the letter.
The situation came to a head on November 9, 2001, at a meeting of the Bank's directors chaired by Rossilli and attended by Groves. The directors voted to withdraw the Bank as a party to Duffy's appeal of the OCC nullification and find new corporate counsel. On the same date, an excess of 20% of holding company shareholders called for a special meeting of shareholders to be held on December 18, 2001, at which they would vote on whether to remove Duffy and Groves as directors of the holding company.
On November 20, 2001, Duffy, in his capacity as chairman of the holding company, called a special meeting of the holding company's board. The meeting included corporate counsel George A. Igler, Duffy, Groves, Rossilli attending by phone, and a man named Armen Markarian. Markarian had recently invested $600,000.00 in the holding company. The Federal Reserve Bank of Atlanta later notified corporate counsel that Markarian could not serve as a director of the holding company until he filed a 914 application and received approval.
The minutes of the meeting indicate that Rossilli objected to Markarian's presence and asked why Pugliese was not present. Groves responded that Markarian had been elected a director of the holding company in August and Pugliese had not. Duffy and Groves complained that they were denied access to the holding company's corporate offices by the corporate Secretary, Glen Gromann, whom they claim acted at Rossilli's direction. Duffy and Groves then began discussing Gromann's removal.
Rossilli objected and then left the meeting by hanging up. Afterward, Duffy, Groves, and Markarian voted to remove Gromann and replace him with Groves, to authorize Groves to vote all of the holding company's shares, and to add Sean K. Olhan to the holding company's board. The meeting was adjourned, to reconvene after a meeting of the Bank's shareholders.
Duffy, Groves, and Markarian then immediately convened a meeting of the shareholders of the Bank, on the ground that they represented the holding company, which was the sole shareholder. The stated purpose of the meeting "was to consider the removal of certain Bank directors and replace them with competent directors who are not necessarily associated with one another." They waived notice requirements, then voted to remove Bank directors Rossilli, Pugliese, Craig Connors, and Richard Paisley, replacing them with Markarian, Olhan, and two others.
*948 Rossilli and Pugliese then called a meeting of the directors of the holding company on December 6, 2001, at which they voted to remove Duffy and Groves as directors. According to the minutes, the holding company's by-laws allow a vote of 60% of disinterested directors to carry a vote, and Rossilli and Pugliese claimed to represent 100% of the disinterested directors. On the same day, Duffy and Groves held a meeting at which they voted to remove Rossilli from the holding company's board. The shareholders went forward with the special meeting on December 18, and an excess of 60% of the holding company's shares voted to ratify Rossilli's and Pugliese's actions at the December 6 meeting, voted directly to remove Duffy and Groves from the holding company board, and elected a new slate of directors for the holding company's board.
Plaintiffs, led by Duffy, filed two separate lawsuits, one naming the Bank and its individual directors as defendants, and the other naming the shareholders of the holding company as defendants. Plaintiffs twice sought emergency hearing on their motion for temporary injunction in the holding company case, but were unsuccessful. Plaintiffs' motion for injunctive relief in the Bank case was set for hearing when they filed a motion to consolidate the two cases. Prior to the injunction hearing, Plaintiffs voluntarily dismissed the Bank as a party defendant due to a conflict of interest stemming from their attorneys' role as the Bank's general counsel.
At the injunction hearing, the judge granted Plaintiffs' motion to consolidate the two cases. The judge later entered the injunction order, which was drafted and submitted to the trial court by Plaintiffs' counsel, and states:
Plaintiffs have a likelihood of success on the merits, have suffered irreparable harm and have an inadequate remedy of law with respect to the continuing deprivation of their rights to control the corporate governance, operations and assets of First Telebanc, in that damages are likely to be speculative, non-quantifiable, and inadequate with respect to such deprivation. Further, such tortious interference and continuing harm excuses actual proof of irreparable harm and inadequate remedy of law.
In its findings of fact, the court stated that Pugliese was never properly elected to the board of the holding company and that the directors of the holding company as of November 2001 were Duffy, Groves, and Rossilli. The court further found that the removals of Gromann as secretary of the holding company and Defendants as directors of the Bank were valid, but the removals of Duffy and Groves as directors of the holding company were not.
For these reasons, the trial court ordered the following:
1. Defendants, and anyone acting in concert with Defendants, are enjoined in any way from acting in any official capacity on behalf of [the holding company], as director or otherwise.
2. Defendants, and anyone acting in concert with Defendants, are enjoined from interfering with Duffy and Groves' performing their duties as the lawful Board of Directors of [the holding company].
3. Defendants, and anyone acting in concert with Defendants, are enjoined from interfering in any way with the access of Duffy or Groves to the corporate funds, records, or offices of [the holding company].
4. [The holding company], Duffy and Groves shall, within 60 days, call an annual meeting, at which meeting the shareholders of [the holding company] shall elect directors as required by the *949 Articles of Incorporation and Bylaws of [the holding company].
5. L. Pugliese, Rossilli, Connors, and Pasley are hereby enjoined from acting as directors of Net First National Bank.
6. Plaintiffs shall file an injunction bond in the amount of $250,000.00 within 72 hours of the entry of this Order or the injunction set forth herein shall be immediately dissolved.
Less than one month after the trial court issued the injunction, the OCC closed the Bank and named the Federal Deposit Insurance Corporation ("FDIC") receiver.
III. Analysis
We review the order granting injunction under the abuse of discretion standard. Weinstein v. Aisenberg, 758 So.2d 705, 706 (Fla. 4th DCA 2000). "In order to obtain a temporary injunction, a party must prove the following: (1) that it will suffer irreparable harm unless the status quo is maintained; (2) that it has no adequate remedy at law; (3) that it has a substantial likelihood of success on the merits; and (4) that a temporary injunction will serve the public interest." Yachting Promotions, Inc. v. Broward Yachts, Inc., 792 So.2d 660, 663 (Fla. 4th DCA 2001) (citing Infinity Radio, Inc. v. Whitby, 780 So.2d 248, 250 (Fla. 4th DCA 2001)). The moving party also must have a clear legal right. Id. (citing In re Estate of Barsanti, 773 So.2d 1206, 1208 (Fla. 3d DCA 2000)); Weinstein, 758 So.2d at 706 (substituting demonstration of clear legal right for third prong of injunction test requiring substantial likelihood of success on the merits). "`Clear, definite, and unequivocally sufficient factual findings must support each of these four criteria before the court may enter the injunction.' "Aerospace Welding, Inc. v. Southstream Exhaust & Welding, Inc., 824 So.2d at 226 (Fla. 4th DCA 2002) (quoting City of Jacksonville v. Naegele Outdoor Adver. Co., 634 So.2d 750, 754 (Fla. 1st DCA 1994)); Yachting Promotions, 792 So.2d at 663.
Defendants argue that the trial court erred in granting the injunction because Plaintiffs did not establish a substantial likelihood of success on the merits or a clear legal right. We agree. The ultimate effect of the injunction was to wrest physical control of the Bank and its assets from Defendants and hand it to Duffy, when Duffy was precluded by federal authority from participating in running the Bank, at the Bank level and the holding company level. Thus, Duffy had no clear legal right to such relief.
It is anything but clear whether Pugliese was a director prior to the November meeting. If she was, as she and Rossilli claim, then the meeting was not properly noticed because she was never notified. Without notice, Duffy and Groves's actions are nullified, meaning Groves did not have proper authority to vote the holding company's shares and remove the bank directors.
Pugliese was not notified of the November meeting, but a September resolution of the board of the holding company states that she was "approved as Director for 914 approval." That language is ambiguous; it could mean that she is simply approved to submit her application, or that she is approved as Director. The Federal Reserve notified the holding company in October that her appointment as director would be approved. Rossilli and Pugliese claim she was a director, while Duffy and Groves deny it. Duffy and Groves claimed that Markarian was a director, and Markarian actually voted at the November meeting, but it is clear that the Federal Reserve never approved him. Duffy was precluded from any leadership role in the Bank because of material misrepresentations and omissions made to the OCC, but *950 at the injunction hearing he described himself as the Bank president. The picture that emerges from these facts is not that the Plaintiffs had a substantial likelihood of success on the merits or a clear legal right to injunctive relief.
The controversy over whether Pugliese was appointed director prior to the November meeting aside, Duffy was not authorized to participate in policy decisions affecting the Bank, per the OCC and the Federal Reserve. Even though Groves actually voted the holding company's shares at the Bank board meeting, it is clear from the record that everything that occurred at the holding company board meeting was related to governance of the Bank. Duffy chaired that meeting and voted on all of the business before the Board, including authorizing Groves's proxy vote, in violation of the OCC's and Federal Reserve's directives. Because Duffy voted illegally at the holding company board meeting and Markarian was not authorized to vote, only Groves's vote remains, and cannot carry the motions because it is not a majority. Thus, the trial court's conclusion that the Defendants were lawfully removed from the board of the Bank is incorrect.
Although a trial court has broad discretion in granting injunctive relief, it is an extraordinary remedy that "requires a clear legal right, free from reasonable doubt." Dania Jai Alai Int'l, Inc. v. Murua, 375 So.2d 57, 58 (Fla. 4th DCA 1979) (citing F.E.C. Railway Co. v. Taylor, 56 Fla. 788, 47 So. 345 (1908)). Not only does Pugliese's potential status as a director of the holding company cast doubt on Duffy and Groves's actions at the November 20 meeting, Duffy acted beyond his legal capacity in voting on policy decisions affecting the Bank. Because the Plaintiffs did not establish that they had a clear legal right to the specific injunctive relief sought, the trial court abused its discretion in granting the injunction.
It is undisputed that the parties did not address the issue of the bond amount at the injunction hearing. Plaintiffs concede this point, but claim that any error is waived because Defendants did not raise the issue at the hearing. "[B]oth parties must be provided with the opportunity to present evidence regarding the appropriate amount of the injunction bond." Offshore Marine Towing, Inc. v. Sea Tow Servs. Int'l, Inc., 778 So.2d 510, 511 (Fla. 4th DCA 2001) (citing Flickenger v. R.J. Fitzgerald & Co., 732 So.2d 33, 35 (Fla. 2d DCA 1999); Bellach v. Huggs of Naples, Inc., 704 So.2d 679, 680 (Fla. 2d DCA 1997)).
Offshore Marine is factually similar to the instant case, in that the trial court concluded a hearing on injunctive relief without ruling, then later issued an injunction requiring a $5,000.00 bond. Id. No evidence was presented at the hearing as to the bond amount. Id. This court affirmed the injunction, but remanded for an evidentiary hearing on the bond amount. Id.
Plaintiffs rely on Bansal v. Bansal, 748 So.2d 335 (Fla. 5th DCA 2000), for their argument that the bond issue is waived. In Bansal, however, Appellee's counsel had prepared the injunction with a blank space for the amount of bond, and when he offered it to the court opposing counsel had an opportunity to object but did not. 748 So.2d at 337. In Offshore Marine, the parties concluded the hearing without any reference to the bond and later submitted proposed injunctions. 778 So.2d at 511. Thus, waiver was not an issue because there was nothing to which the parties could object at the hearing. This is precisely what happened at the injunction hearing below.
Because we resolve this appeal on the basis of the lack of clear legal right, the only remaining issue we need address is *951 the bond amount. The "conundrum" presented in this case is like that in Lotenfoe, M.D. v. Pahk, M.D., 747 So.2d 422, 426 (Fla. 2d DCA 1999), in which the appellate court held both that the appellant was wrongfully enjoined, and that the bond amount was improperly set without an evidentiary hearing. Dissolving the injunction left "no functional need to set a new injunction bond;" however, damages for wrongful injunction are generally limited to the amount of the bond. Id. at 425-26.
Noting that, logically, the evidence presented at a new bond hearing would be that of the actual damages suffered by the enjoined party while the injunction was in effect, Lotenfoe adopted the holding of the Third District in SeaEscape, Ltd. v. Maximum Marketing Exposure, Inc., 568 So.2d 952 (Fla. 3d DCA 1990):
[W]hen the circuit court did not conduct an evidentiary hearing on the bond amount, and when the enjoined party proceeded expeditiously to exhaust available remedies, the damages for the wrongful injunction would not be limited by the erroneously-set bond.
Id. at 426 (citing Provident Mgmt. Corp. v. City of Treasure Island, 718 So.2d 738, 739 (Fla.1998) (explaining that "damages for a wrongfully issued injunction are not always limited by the bond amount"); Leibowitz v. City of Miami Beach, 683 So.2d 204 (Fla. 3d DCA 1996)). We agree.
Accordingly, we reverse the order granting injunction, and remand for imposition of costs and damages for the wrongful injunction not limited to the amount of the bond.
REVERSED AND REMANDED.
POLEN, C.J., GUNTHER and MAY, JJ., concur.